at all. 15 minutes for the plaintiff and 15 minutes to be shared by the defendants. And it will be Francis L. Landry for the appellant. Good morning, your honors. May it please the court. I'm Frank Landry. I'm representing Princess Wells in connection with the appeal. This is a case appeal brought from a grant of summary judgment issued by the district court. Ms. Wells was a long-term hourly production employee of Chrysler. She started out in Kenosha, Wisconsin and then was transferred to the Toledo Machining Plant. Her hire date started in 1979. And the critical events that gave rise to this case started in December of 2006. She was a production employee and a member of UAW Local 1435. In the initial case before the district court, she brought claims of racial, age, sex discrimination, and disability discrimination as well as retaliation. The issues before this court today are disability discrimination and retaliation claims primarily. Ms. Wells had a series of restrictions which led her to be transferred under the company's PQX policy for dealing with transfers of persons with disabilities into a temporary job. There were a series of layoffs in the temporary department in the course of 2006. So she went to the company and the labor relations supervisor, went through the PQX procedure, and located another job called FinSetting, which is in another department. This would have given her a permanent home department and hopefully, if it worked out, would have avoided the layoffs that she was encountering in the temporary position. Once Ms. Wells went to that department, she encountered shoulder problems almost immediately. The first day she went to the plant medical department, I believe the record shows she started in that position December 11, 2006. The plant doctor, who was instrumental in setting restrictions and passing on whether someone was qualified for the job, felt that maybe with a little coaching she would be okay. She was sent back to the job and then again went to plant medical and had continued problems a couple days later. She went off then and really never returned to the plant again. She went off because of the shoulder pain, so it's documented that she made a couple trips to plant medical in December before she went off. Later on, she brought in a doctor's slip to justify her absences from her family physician or personal physician. These restrictions, at first, were listed by the doctor and then they would be taken in by the employee. It would go to the plant medical and the plant doctor then would be in charge of setting the restrictions. They were set and continued on through 2007. The restrictions that she had led her to be put off on what they call a Code 31, which is someone that has restrictions but there's no work that she can perform. Ms. Wells is contending here that she should not have been put on this first position. She almost immediately, this fin-setting position in December, and she was frustrated because she was on the Code 31. She was receiving her unemployment compensation and the sub-pay, which was getting her almost all of her wage, but at that point there was no documented efforts to find her any work. So she just stayed off of work and periodically was bringing in slips. So this continued on through 2007 and in 2008, in January, she brought in another follow-up slip from her doctor. This slip was a worker's compensation slip, but the doctor checked totally disabled at this time, but also listed a series of restrictions. So the company took that. They continued her on the Code 31. I believe she brought in another slip in March, and they continued her on through the first half of 2008 on Code 31. She, in May of 2008, was approached by a receptionist at Chrysler with permanent disability retirement paperwork. Again, she's on a Code 31 at this point. I believe the slip from her doctor was to expire June 26 of 2008, so just in close proximity to that. When you say the slip from her doctor, is this Dr. Hall? It's Dr. Hall, correct. And there was at some point some effort by the plant doctor to suggest that she should get other opinions and maybe other treatment because of some concerns about Hall and his abilities? Well, the documentation, yes, Your Honor, the documentation appears to suggest that she was concerned about that she couldn't make a good judgment call based on what she was getting from Dr. Hall, and it seemed to be inconsistent. Ms. Wells declined to produce further information. She kept bringing these slips in from Dr. Hall. But there was even some, and this led to even further issue here in August of 2008, and this is when this came to issue. When Ms. Wells continued to resist producing further evidence or signing just a release for the company, she was then called in and transferred from Code 31 to Code 52, which is a total disability. But the significance of that is it's unpaid. So there are a couple concerns that I have. One is, is there any showing that there was a vacant position that Ms. Wells should have been assigned to as part of the accommodation process and requirements? Well, yes, Your Honor, there were two union stewards that testified in their depositions, Ms. Dennis Schultz and Edward Phillips, and while they didn't identify specific decisions, Ms. Schultz testified that there were jobs available that she could perform, and Phillips described the process. Usually they try to keep the employees in the plant, and there's almost always something that they can do. But they did not name any specific positions. No, that's correct, Your Honor, they did not. And it appears from the PQX report, or the Labor Relations Supervisor, Mr. Weber, in his deposition in page 33, there does not seem to be records of what positions are, you know, the PQX recording is not, we really can't go to that, anything there, and identify what might have been available and what not. It's just kind of done on a, appears to be an ad hoc basis. It's not available to the district judge. Correct. So the concern that we see here is that they carried her from January of 2008 on this Code 31, and he's checked the box, totally disabled, but also listed the restrictions. The plant doctor, Dr. Parkins, continued these restrictions, continued the Code 31, but then while this Code 31 is still in effect, the receptionist is indicating the deposition testimony, presents some totally disability retirement paperwork to Ms. Wells, and then the union has discussions with her about going ahead and just signing off and avoiding further problems with Dr. Parkins and the plant medical. Could you clarify exactly what you think is the wrong that was done to your client? Well, I think... Because it was lost in all the trees here. Right, I know there's a continuum. She's concerned about the initial fin-setting placement, that maybe she shouldn't have been placed there, that it was something that, you know, I know plant medical made the decision on it, but she felt she was not able to, she went along with it, but she had problems, so she felt that was wrong in the first place. But it was wrong, why? Because it violated her ADA rights or because of some other reason? Well, I think she felt she should really, it was a position she couldn't have handled, and they shouldn't have put her there in the first place. Because of her physical limitations? Correct, correct. Was it illegal for them to put her there? Well... That's, I think, what Judge Moore is asking you. That's my question. Yeah, it may not... You say they shouldn't have done it. We're not here to second-guess assignment positions in factories. We're here to see whether there's legal violations. Yeah, but I think where it would tie into is maybe they should have found something that would fit her. Yeah, but I take Judge Moore's question to be, what did that violate when they should have done that? Or is it just would have been good management? Well, maybe that one isolated incident in December, that assignment, I may have to agree that that is a management decision. But I think taken in the continuum of what... Well, then... Then where is the ADA violation? Well, I think maybe the... What I would focus on, there's no assignment. They don't have any records. The union's saying there's almost always jobs available. But then when we get to this taking away the Code 31, I know there's an issue on the medical records, but they start to call her in in May. Dr. Hall's most recent slip is going to run out, I believe, June 28th. They're calling her in, presenting her total disability retirement paperwork, which she's opposed to. And then she files a Civil Rights Commission charge. And then in July, she's confronted with the problems with... Well, they're saying, well, now Dr. Hall's letter is... We need more information. But he did list... Have they not been asking her for more information before July? You're talking about July 08? 08. I believe they were trying to get her to go for more treatment, I think, earlier in 07 and wanting her to see a doctor over her shoulder. And the backdrop of this is there were some workers' comp proceedings going on through other counsel, which I don't know to what extent that motivated that. But if the slip was good enough from January of 08, why did it all of a sudden change in August of 08 after she filed a Civil Rights Commission charge and had voiced concerns about how this was all handled? So that's not an ADA discrimination claim. That's more of a retaliation claim? Well, maybe. I think so, probably more retaliation. It may be a perceived disability because they categorized her as totally disabled at that point and basically took away her pay at that point. Thank you. Thank you. Good morning, Your Honors. I'm Heidi Hartman. I'm counsel for Chrysler Group, LLC. I'm here with my co-defendant. Joan Torczewski represents the union in this case. I've asked for 10 minutes of the time this morning and have a short time then to impress upon you that Chrysler Group acted fairly, honestly, consistent with its policies, and most importantly, lawfully with respect to Ms. Wells at all times, and to impress upon you that summary judgment was properly granted on the two claims at issue against Chrysler in this case, which are a failure to accommodate claim and a retaliation claim. Can you focus on that period where there was no letter from the doctor saying that she couldn't work? There was just a period. How long was that period? There are three periods, I think, at issue that we can talk about this morning. May of December of 2006 to May of 2007, Ms. Wells' physician said that she was completely unable to work. That's one of the periods I wasn't referring to. Okay. The next period then begins May of 2007 and goes to December of 2007, where her physician indicated she had restrictions of many restrictions, Your Honor, but most importantly, I think, no use of the left arm and no use of her left hand. And then the third period, he also said she couldn't work. Is that right? That's correct. The third period. At least that's what I'm curious about. Yes. We have this period between. . . How long is that period? Seven months, Your Honor, from May of 2007. What's your argument with respect to that period? My argument with respect to that period is that there was no failure to accommodate. Ms. Wells was given an accommodation of leave. Leave is a reasonable accommodation under the ADA in this circuit precedent. Is that what the district court held? I believe so, yes, Your Honor. I guess when we're looking at ADA accommodation issues, we have to look at whether she's qualified. She's got restrictions that say she cannot use her left arm or her left hand. The record is uncontroverted that she is left-hand dominant, and she is a factory production worker. The record is also uncontroverted by Mr. Weber's testimony that there are no jobs available within the production realm in this Chrysler machining plant. I take her argument to be that there's other testimony that there are sort of make-work jobs available. Make-work is not the right word, but whatever the word is. Easy-to-do jobs. What do you call those? She has offered some testimony from union stewards that Chrysler makes an effort to find work for individuals and keep individuals placed on jobs, and that is absolutely true. The point here is that those union stewards did not know what Ms. Wells' restrictions were, so therefore they're giving testimony, yes, Chrysler finds jobs and Chrysler likes to place employees, and we all work together to place employees on jobs. But they didn't know that she was restricted during this seven-month period of time from using her dominant arm. So was there any evidence? This is summary judgment, right? This is summary judgment, yes. Was there any evidence in the record one way or the other about whether there were in fact vacant jobs for people who could only use the non-dominant side of their upper body? I can't remember that she had lower body restrictions. She had restrictions of all kinds. But one could imagine a workplace where somebody could use their non-dominant hand to do something, and it was a one-handed job, and that person could fill roles. I'm just curious, was there any evidence one way or the other whether there was a vacant job that somebody with a one hand, one half of the upper body, not the dominant half, could do? There's Mr. Weber's testimony that there were no jobs available for an individual who could not use their dominant arm. No one-handed jobs were available in the plant. And then the only other, and correct me if my summary is wrong, but the only other testimony regarding vacant jobs was the general testimony of the union stewards that there could be jobs, or there would be jobs, or there might be jobs, and you tell me what the actual language is. What did the union stewards say? That there wasn't, please, I don't want to fill it in with the wrong words. Let me look and tell you, because I don't have off the top of my head precisely what their words were. I know that in general they testified that the company and the union worked together to try to place people on jobs when they are injured. There's also- Your recollection is, and we'll check it ourselves, but your recollection is that the stewards didn't say there's this job that somebody who has only a non-dominant hand can do. They absolutely did not. They did not address any specific job for Ms. Wells at all. I had the impression of some jobs sweeping. Was that pertaining to- One of the union stewards gave a throwaway comment in his deposition that some employees are just pushing a broom around in a corner, I think inferring that some jobs are not real jobs, and some employees are placed on these jobs. I think it's important to note that Ms. Wells, and what the record shows, is the only discussion that Ms. Wells had with Chrysler during this period of time, this seven-month period from May of 2007 to December of 2007, occurred with Dr. Parkins in July of 2007, when Dr. Parkins was discussing these severely limiting restrictions with Ms. Wells. Dr. Parkins asked her, could you go back to your former job? Ms. Wells said, no, I can't. She couldn't think of any other jobs that she could do. Therefore, in response to her inability to identify any jobs that she was able to do at the time that she could be placed on, Chrysler granted her the reasonable accommodation of leave. And because she was restricted, had physical restrictions, that they were not able to place her with, so she was physically able to work, but with restrictions, and the company was not able to place her on a job because under Mr. Weber's testimony, there are no jobs for someone who, a production worker using just one arm, the non-dominant arm,  she's providing evidence that she can work with restrictions, but the company's not able to place her with restrictions. That entitles her to paid leave. What Mr. Landry referred to as the change in that status occurred in July of 2008, after Ms. Wells refused to provide medical documentation that made clear to the company whether she was able to work with restrictions or whether her physician opined that she was unable to work at all, because her physician was submitting medical documentation that said both, that she is unable to work and included, in addition to that statement that she's unable to work, included physical restrictions. Dr. Parkins sought clarification for several months from Ms. Wells, continued her paid leave during this period of time that Dr. Parkins was seeking clarification as to whether, what does this mean? What do I put, Dr. Parkins is asking, what do I put into the record? Do I put that you're not able to work or do I put that you're able to work with restrictions? I need clarification from a physician. Ms. Wells refused to provide that clarification. A meeting was held with her, her union steward was present, Mr. Weber, the labor relations supervisor was there. They explained to her in uncertain terms, you know, this is what we need from you to be able to place you. We can't place you on any job if you don't bring us any medical certification that shows us what your restrictions are or that says that you are able to work with restrictions. And she simply refused to provide that clarification. So Chrysler was forced, I guess under those circumstances, to make the change in the leave code because the medical documentation that they were receiving from her physician said she was unable to work. And under their policies, that would be a Code 52 medical layoff that did not entitle her to any pay. You mentioned that. I'm sorry. Sorry, but I'm going to sort of take you to your other point. You said that the other claim was a retaliation claim, and I see your yellow light is on. So I did want you to have a chance to address that. Thank you very much, Your Honor, for moving me along. She has, I guess she argued in her brief, some additional factual basis for a retaliation claim if we're focusing on the change in her leave status. That is not an adverse employment action. It is perfectly consistent with Chrysler's policies, and any causal relationship between any protected activity is broken by her failure to follow Chrysler's policies. Her own intentional act to not comply and not to provide the clarification that was requested from her breaks any inference raised by any temporal proximity to any charge that she filed with the EEOC. There's case law cited in my brief on that issue, and I think the pretext issue also supports granting summary judgment to Chrysler on that point because she failed to establish that we didn't act consistent with our policies or that there was any false reason for making that change. Thank you. Thank you. Joan Torczewski Good morning. May it please the Court, I am Joan Torczewski, and I am here representing UAW Local 1435. I did not hear Mr. Landry describe any claims that his client made against the union in his oral argument, but he did make those claims in the brief, so I will address them. In her first charge against the union, Ms. Wells alleged failure of representation because of her race, age, and sex when she was placed on the finsetting job. In her second charge, she alleged that she was denied fair representation in retaliation for the first charge when she was given disability papers. And in the final charge, she contends that she was denied fair representation when the union failed to grieve the fact that she was taken off sick leave and put on a Code 52. Thus, it is beyond dispute that Ms. Wells herself raised the issue of fair representation against the union in each and every one of her charges. As such, the district court properly first considered whether or not the union breached its duty of fair representation in determining the discrimination charges. It has been held that the duty of fair representation and the statutes prohibiting discrimination have some overlap and that courts have also applied the law of fair representation in determining whether or not the fair representation was denied either in retaliation for filing a charge or because of discrimination charges. In this case, the district court properly applied the existing law on fair representation cases and found that negligence or mistaken judgment were not enough, that the plaintiff had the burden to prove arbitrary, discriminatory, and in bad faith conduct and she did not do so. One of the claims that Ms. Wells initially made, and I'm not certain whether or not she's continuing that claim, is that she claims that she should have been allowed to go back to the fin-setting job after she was put on the fin-stacking job. She did present some evidence that showed that white males did perform that job after she was removed from the job and placed on a permanent position, but she could not demonstrate that no African Americans were placed on that job. In fact, she admitted that black women were placed on that job and persons under 40 were placed on that job. So she could not prove discrimination, that she wasn't given a second opportunity. With regard to the placement of her on the fin-stacking job, the permanent position that she only lasted three days on, there's no evidence that she ever complained of. And in fact, I would suggest that the fact that she was only on that job for less than three days demonstrates that she really did not even give the job an honest try. She also complains that she was retaliated against by the two union stewards, one benefits rep, Frank Bills, and a union steward, when they would not protest the fact that she was put on a Code 52 until she produced the medical records. During her deposition, she said she could recall no evidence that this was done in retaliation. Here, the evidence also shows that not just the company, but the union stewards told Ms. Wells over and over again that she has to bring in the company-requested medical information or let her doctor communicate directly to her own doctor to get that information. The evidence also shows that the company does this routinely, that if individuals do not produce the proper medical documentation, they are taken off the regular sick leave and put on the Code 52, which is unpaid sick leave. With regard to the last charge of retaliation, which was when she was given the disability papers, we believe that this was not an adverse employment action. They were trying to help Ms. Wells to determine how she should finish out her factory life, and in fact, when she says, I don't want to do disability retirement, there was no push to make her sign the papers. She was told it was voluntary, she didn't have to sign the papers, she didn't have to sign the papers, and the matter was closed. Therefore, we believe that the district court properly granted summary judgment to the union on all the claims against it. I just have a couple points here I want to make here. With respect to the placement on the jobs, Mr. Weber had testified in his deposition, I believe at page 33, when I questioned, are there any records of what details, any records that reflect any efforts to locate positions through PQX, and his answer was no. Dr. Parkins would document situations in the medical records if she was involved in any placement efforts, but there was no log for PQX placement. The problem is we don't know to what extent any effort was taken in her case, as well as other cases, and we do have the two union gentlemen who testified, and Ms. Wells herself has indicated in her deposition and in the exhibit she attached some jobs that she was able to perform. The other issue that I wanted to point out is that slip that was presented by the plaintiff, by the appellant, in January of 2008 from her doctor, it checked totally disabled, but it also listed the functions, and all the slips after that point were the same, and there's an inherent inconsistency. I think there is, and I believe the record will show, there was a workers' compensation proceeding carrying on, and it's a workers' compensation type of form that she submitted. I think it says BWC Medco type of form that she submitted to the company, so the company was well aware of the workers' comp proceedings, and they did, in fact, carry this slip for over six months. So with that, unless the court has any further questions, I submit. Thank you very much. Thank you both for your argument, and the case will be submitted.